**JAMERSON et al. v. UNITED STATES.**
No. 4736.

Circuit Court of Appeals, Seventh Circuit.
Aug. 11, 1933.

Rehearing Denied Oct. 12, 1933.

P. H. Cullen, of St. Louis, Mo., John M. Karns, of East St. Louis, Ill., and James E. Carroll, of St. Louis, Mo., for appellants.

J. Fred Gilster, of East St. Louis, Ill., for the United States.

Before ALSCHULER and SPARKS, Circuit Judges, and FITZHENRY, District Judge.

FITZHENRY, District Judge.

Defendants appeal from a judgment of conviction for violating 18 USCA § 338 (section 215, Criminal Code), and conspiracy to violate the same section.

The indictment consists of six counts. The first five charge defendants with having used the mails to defraud, and count 6 charges a conspiracy to use the mails to defraud. A demurrer to the indictment was overruled, and pleas of not guilty were entered. At the conclusion of the government's evidence, a motion was made to instruct the jury to find the defendants not guilty on each count; the motion was allowed as to count 2 and denied as to all others. At the conclusion of the evidence the motion for a peremptory instruction was renewed and denied. After verdict the usual motions for a new trial and in arrest of judgment were made, submitted, and denied; whereupon the court entered judgment and sentenced defendants. To set aside that judgment this appeal is prosecuted.

Defendant Jamerson was a business man, engaged in dealing in musical instruments, radios, and victrolas, and conducted what is commonly called a "music house" in East St. Louis. He also conducted a business known as the "Jamerson Motor Company," located in an outlying part of the city, and handled musical instruments, radios, victrolas, automobiles, and accessories. Defendant Leman was engaged in the insurance business as an independent adjuster.

On July 6, 1929, Jamerson leased from Fred W. Zeigenhein the property known as 1100–1104 Illinois avenue, in the city of East St. Louis, located in an outlying business center, for a period of five years, at a rental of $350 per month. One of the provisions of the lease was that "damage by fire or other calamity rendering said premises untenantable shall terminate this lease." The building was a one-story brick, with a large display room having an appropriate glass front on Illinois avenue. Jamerson immediately went into possession of the premises under this lease, and so remained until a fire occurred about midnight, January 26–27, 1930.

Until the latter part of 1929, he carried a dealer's blanket fire insurance policy, written by the Rankin-Benedict Company of Kansas City, Mo., which covered loss by fire and theft to the extent of $25,000 upon the new and used automobiles, etc., placed and kept by Jamerson in the building, and under which policy Jamerson was required to make the insurer a monthly inventory of the new and used automobiles and other property placed or kept in the building and covered by the policy.

Upon the suggestion of defendant Leman, defendant Jamerson wrote the Rankin-Benedict Company at Kansas City on December 21, 1929, canceling the blanket policy. Just before doing so, new policies, with broader coverage than the old, were written in five old line fire insurance companies, aggregating a total of $48,000. The stock in the building was steadily augmented by the transfer of musical instruments of various kinds from the downtown store, automobiles, automobile accessories, and supplies; and a very substantial repair shop was established.

At or about midnight of January 26–27, 1930, fire broke out in the brick building. The display room was very badly damaged and the contents very largely ruined, while the repair shop was practically destroyed. Shortly thereafter proofs of loss were made out by defendant Leman, and signed and sworn to by Jamerson, as required by the policies, claiming substantially a total loss. Leman took them personally to the Western Adjustment Company's offices in St. Louis, Mo., which was acting for the various insurance companies. Several days later Leman returned to the Western Adjustment Company's offices and asked for the return of the proofs of loss, stating some mistakes had been made, and it was desired to correct them. The officers in charge of the Adjustment Company refused to return the proofs of loss to Leman as requested, but later caused photostatic copies of them to be made and then caused the original proofs to be sent by registered mail to Jamerson. Under date of January 31, 1930, after the fire, Jamerson sent a registered letter through the mails to Fred W. Zeigenhein, notifying him that he had elected to terminate the lease, to become effective as of that date.

The government contends that Jamerson was anxious to get rid of the lease on the building, which was for a term of five years, aggregating rentals in the sum of $21,000, of which he was to pay $350 per month; that he talked to Leman about it; that Leman examined the lease and advised him to consult his attorney about the provision it contained with reference to becoming void if the property

became untenantable by reason of fire or otherwise; that he urged Jamerson to submit the matter to his own lawyer, Joe McGlynn; that Jamerson did so and learned that if the property was sufficiently damaged it would void the lease, and was advised that his insurance matters should be looked into, and learned that the dealer's blanket insurance policy was not broad enough and contained provisions requiring monthly inventories, and that accordingly the dealer's blanket policy was canceled, and new policies procured in the old line companies; and that Leman was to take care of the fire.

The jury found defendants guilty on counts 1, 3, 4, 5, and 6, and each defendant was sentenced to imprisonment on each count, to run concurrently, and each fined on count 6.

The errors assigned and relied upon arise out of the failure of the trial court to sustain the defendants' demurrer to the indictment, the rulings on evidence, and the failure to allow the motions for a directed verdict.

Counts 1, 3, 4, and 5 of the indictment each sufficiently charges a scheme to defraud the insurance companies, and the use of the mails in the process; while the conspiracy count is in usual form and contains all of the necessary averments to sufficiently inform the defendants of the nature and character of the charge laid against them, and to bring the conspiracy within the provisions of section 37 of the Criminal Code (Title 18 USCA, § 88).

The court permitted one Seifard to testify on behalf of the government that one Stull had come to him and said he had been told by defendant Leman that he could talk to him about the Jamerson fire; that Stull told him that Leman had hired him to burn down Jamerson's garage and hadn't paid him all his money, and that Leman had double-crossed him and he wanted to "know how much he would pay to put the squeeze on Mr. Jamerson to collect on the lease, and I said I would have to talk it over and take it up with Mr. Zeigenhein." Stull was in the courtroom and the government's counsel said, "Stand up, Mr. Stull. Is that the man?" and the witness answered, "Yes, sir."

Stull was not indicted as a co-conspirator or named as one of the defendants in the several counts charging the substantive offenses. Notwithstanding the fact that he was present in court at the time of the trial, he was not called as a witness by either side. Counsel on behalf of defendants objected very strenuously to the testimony of Seifard with reference to conversations with Stull, and also the manner in which Stull was identified. The

trial court originally overruled the objection to the admission of this testimony. Later, after the noon recess, the jury was instructed that the court had upon further deliberation changed his mind and reached the conclusion that the testimony was incompetent; and it was therefore excluded and the jury directed to disregard it.

The principal errors assigned and complained of involve the rulings of the court with reference to the admission of the conversations between Seifard and Stull. It is contended that notwithstanding the fact that the ruling of the court was finally favorable to defendants, the effect of both rulings was so prejudicial to defendants with the jury as to amount to a denial of justice; also as to the admission of the alleged conversations testified to by Seifard with defendant Leman.

The admission of these latter conversations was objected to by counsel for each defendant. The objection was sustained as to defendant Jamerson, but overruled as to defendant Leman. The conversations with defendant Leman were competent as against him, and the court very clearly directed the jury to disregard them in so far as the other defendant was concerned; and in this there was no reversible error.

As to the conversation between Stull and Seifard, concerning which the latter testified, the record fails to show that the defendants by counsel moved for leave to withdraw a juror and to declare a mistrial. It is true that early in Seifard's testimony, when he was detailing a conversation which he had had shortly after the fire with defendant Leman, he told what Leman had said in some of the conversations with reference to other and prior settlements of a questionable character with insurance companies with which he (Leman) had been connected.

On behalf of defendant Leman counsel objected strenuously, moved that the evidence of the conversation be stricken on behalf of Leman, and that the jury be discharged. The motion was denied. Later in the examination of Seifard the conversation with Stull was brought out. Objection to its admission was very earnestly made and overruled, but no motion to withdraw a juror and declare a mistrial was interposed. Toward the conclusion of Seifard's direct examination, the recollection of the witness of a conversation which took place between the witness and Leman in March, 1931, was refreshed by counsel for the government, whereupon he said he recalled it. Counsel for Leman objected to that conversation as being after the conspiracy had ended

and the indictment had been returned. The objection was overruled, whereupon counsel for Jamerson made the further objection that Jamerson had no part in the conversation and asked the court to again charge the jury that any statement made by Leman outside the presence and hearing of Jamerson was not binding upon him. The objection was overruled, and the conversation of March, 1931, detailed by the witness, the gist of which was that the witness might forget a lot of stuff when the trial comes up. He also added that he had seen him another time near his place of business when Leman had said that the witness had better forget all about the fire when the trial comes up. Then the witness was turned over to counsel for defendants for cross-examination. The cross-examiner examined the witness as to the conversation with Stull and brought out its substance again and went into it at length, after which the court told the jury that, after deliberation, he had changed his mind and had concluded to change his ruling, and very clearly and fully instructed it not to give any consideration to the conversation had with Stull on the occasion described. No objection was made on behalf of defendants, or exception taken, but the cross-examination proceeded. Seifard testified to several different conversations with Leman.

The witness was cross-examined about the sprinkler losses that were adjusted with Fred Gerold in 1926, or within the last three years, in which the actual loss was $25,000 or $30,-000, but Leman had collected $130,000. At the conclusion of the cross-examination, which was somewhat extended, no motion was made to withdraw a juror and to declare a mistrial, or to discharge the jury. The rule applied by this court in Gerard v. United States, 61 F. (2d) 872–875, is controlling here.

As was said in Billiter v. United States (C. C. A.) 23 F. (2d) 678, 679: "In this case the judge considered a withdrawal to be remedy enough, and gave respondent that benefit. If counsel thought this remedy was insufficient, he should have said so; the record contains nothing to show that he was not content with the ruling which was made in response to his objection, and which clearly showed the intent of the court to give the relief thought necessary."

■■ It is also seriously complained that the court permitted Madge Millard to testify that she was in Jamerson's store on Carlinville avenue, East St. Louis, on the morning after the fire; and that the man identified as Stull came into the store. The assignment is pred-

icated upon the theory that the testimony with reference to Stull's presence in the store was given after the court had stricken from the record the testimony of Seifard as to Stull. It might also be suggested that it was also after the court had instructed the jury to disregard Seifard's testimony as to Stull and after counsel on behalf of defendant Leman had reopened the subject by further cross-examination of Seifard as to Stull.

Another assignment is based upon the fact that the witness Seifard was permitted to leave the witness stand and walk down to where Stull was seated among the spectators, after which counsel for the government made the remark, "Stand up, Mr. Stull," and he obeyed; and that therefore the rights of the defendants were seriously prejudiced.

An examination of the record shows that the man had been described in the testimony of the witness; that Seifard had pointed him out from the witness stand; but that there was some confusion between counsel as to the pointing in the courtroom, whereupon the witness was permitted to proceed to make the positive identification of the man with whom he had talked. In this there was no reversible error.

One of the assignments of error, based upon the contention that the conversations of the witness Zeigenhein with defendant Jamerson "were not admitted or conceded but on the contrary denied by the defendants and were therefore wholly inadmissible," is untenable.

■■ Error is also assigned because the court did not permit an attorney for counsel for defendants to appear and examine them with reference to certain conferences had in their offices, and which were referred to by witnesses on behalf of the government. This was a matter in the sound discretion of the court, and while it is true complaint is made of the ruling of the court, it is not contended that the court abused its discretion in this regard.

■■ It is also claimed that, because the Assistant United States Attorney stated in the presence of the jury that he had served notice on the defendants to produce the insurance policies in question and other documents, therefore defendants' constitutional rights have been violated. This notice was served by counsel with a view to the introduction of secondary evidence, and it was publicly known that all of the policies and documents referred to were in the possession of the defendants, and that civil suits had been commenced in the state courts upon the policies. It was error to make this demand in the man-

ner in which it was made, but in the light of all of the facts and circumstances surrounding the demand referred to, and the general knowledge of where the documents were, the error in this case is not reversible.

Many other assignments of error are made on behalf of appellants. Most of them are very general in their nature, while others, more specific, are involved in the foregoing discussion. In the view we take of them, they are without merit.

The evidence clearly shows that, as charged in count 1, Jamerson used the mails to notify the Rankin-Benedict Company of Kansas City of the cancellation of the dealers' blanket policy; and, as charged in count 3, that he received the return proofs of loss through the mails; and, as charged in count 5, that he used the mails to notify Fred W. Zeigenhein of East St. Louis that he was exercising his option to declare the lease void by reason of the premises becoming untenantable.

 Appellants (defendants) complain that this conviction should be set aside because, if any use of the mails in the conspiracy is shown, it was a conspiracy to commit the crime of arson under the state law. If it were such, then it would come clearly within the holding of the Supreme Court in Fasulo v. United States, 272 U. S. 620, 47 S. Ct. 200, 71 L. Ed. 443, and should be set aside. However, when a conspiracy is charged to use the mails to defraud certain insurance companies, and to obtain from them money by means of false and fraudulent practices, pretenses, claims and representations and affidavits, as set forth in the indictment, involving a scheme to cancel certain insurance policies, get other insurance in a larger amount upon the property, cause it to be destroyed by fire, and then collect money from the insurance companies, as well as to relieve the defendant from the obligations of a lease of the building which was to be destroyed by fire, the crime of arson is not thereby charged.

Of course section 215 is not designed to include such crimes as murder, rape, arson, burglary, or blackmail. However, where the acts which constitute the crimes referred to are a part of the operation in the prosecution of the scheme to defraud, then they are overt acts pursuant to the object of the conspiracy. The mere fact that some overt act of one of the conspirators may also be a crime under the state law does not change the character of a conspiracy such as is here involved.

 Without going into the rulings of the court upon the admission and exclusion of testimony with reference to counts 1, 3, 4, and 5, it is sufficient to say that on count 6, the conspiracy count, we are persuaded that there was ample warrant to submit the case to the jury. This was done after a very full and clear instruction by the court as to the law applicable to the case, to which there was no exception.

The evidence was very conflicting; it was the province of the jury to reconcile the conflicts in the evidence and to find a verdict. In such circumstances we are without power to disturb that verdict. Defendants were sentenced separately on each count, with the proviso that the sentences should run concurrently. As they do not exceed the maximum authorized as punishment for the offense charged in the sixth count, we need not consider any other count. Abrams v. United States, 250 U. S. 616, 40 S. Ct. 17, 63 L. Ed. 1173; Sinclair v. United States, 279 U. S. 263, 49 S. Ct. 268, 73 L. Ed. 692.

The judgment must therefore be, and is hereby, affirmed.